## THRUSH v. FULLHART.

(Circuit Court of Appeals, Fourth Circuit. November 9, 1915.)

No. 1348.

1. LIMITATION OF ACTIONS &mdash;199—QUESTIONS FOR JURY.
    In an action for breach of promise of marriage, evidence as to whether the engagement was broken more than one year prior to the commencement of the action, or whether it continued until within the period of limitation, *held* to justify the refusal to direct a verdict in favor of defendant.
    [Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 727–730; Dec. Dig. &mdash;199.]

2. APPEAL AND ERROR &mdash;1002—REVIEW—QUESTIONS OF FACT.
    In an action for breach of promise of marriage, where the evidence as to whether the action was barred by limitations was conflicting, and the jury found in favor of plaintiff upon a proper submission of this question, its finding was not reviewable.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937; Dec. Dig. &mdash;1002.]

3. BREACH OF MARRIAGE PROMISE &mdash;31—DAMAGES—EXCESSIVENESS.
    Plaintiff, a young lady of many accomplishments and good character, became engaged to marry defendant, and the engagement continued for 17 years. Defendant induced plaintiff to borrow $50 from her sister, which he agreed to repay, but never did. Plaintiff loaned defendant money to buy books and for other purposes and gave him presents from time to time, and also lent or gave him a gold watch which he retained during the time of their engagement. Defendant was worth about $12,000. *Held*, that a verdict for $4,000 was justified by the evidence and would not be disturbed.
    [Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 47; Dec. Dig. &mdash;31.]

4. BREACH OF MARRIAGE PROMISE &mdash;26—DAMAGES RECOVERABLE.
    In an action for breach of promise of marriage, where plaintiff had reasonable expectations of an advantageous settlement in life, she was entitled to recover damages therefor, and in addition thereto for pecuniary loss as well as compensation for her injured feelings, anxiety of mind, wounded pride, and mortification.
    [Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 38, 39; Dec. Dig. &mdash;26.]

5. BREACH OF MARRIAGE PROMISE &mdash;31—DAMAGES—PROVINCE OF JURY.
    In an action for breach of promise of marriage, it would be impossible to fix a definite measure of damages, and the jury may consider all the facts and circumstances and exercise their discretion in determining the

&mdash;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

amount of damages if their conduct is not marked by prejudice, passion, or corruption.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 47; Dec. Dig. ☞31.]

**6. APPEAL AND ERROR ☞1015—REVIEW—AMOUNT OF DAMAGES.**

Where a new trial is applied for on account of excessive damages and refused, the damages must be outrageously excessive, or a court of error will not interfere.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3860–3876; Dec. Dig. ☞1015.]

In Error to the District Court of the United States for the Northern District of West Virginia, at Martinsburg; Alston G. Dayton, Judge.

Action by Iva Lea Fullhart against William V. Thrush. Judgment for plaintiff, and defendant brings error. Affirmed.

Wm. MacDonald and F. C. Reynolds, both of Keyser, W. Va. (Forrest W. Brown, of Charlestown, W. Va., on the brief), for plaintiff in error.

Wm. H. Griffith, of Keyser, W. Va., and Roscoe A. Heavilin, of Marion, Ind., for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. This is an action for breach of promise of marriage commenced in the District Court of the United States for the Northern District of West Virginia by Iva Lea Fullhart, defendant in error (hereinafter referred to as plaintiff), against William V. Thrush, plaintiff in error (hereinafter referred to as defendant).

Suit was begun June 4, 1912, and the case was first tried before a jury in September, 1912, at which trial a verdict was rendered in favor of plaintiff for $5,000, and the case was brought to this court upon a writ of error. The judgment of the court below was reversed, and the opinion filed therein is to be found in 210 Fed. 1. The case was remanded to the lower court, and there a second trial was had which resulted in a verdict in favor of the plaintiff in the sum of $4,000. and the case comes here again on a writ of error.

The case was tried in the court below on the theory that the engagement or contract to marry was entered into by the parties in 1894, at Westerville, Ohio, where the parties were students at Otterbein University.

It is contended on behalf of the defendant that their engagement was broken by him in a letter written by him in the summer of 1907, and that therefore there was not sufficient legal evidence to show that the contract to marry was in existence within the statutory period during which the plaintiff could institute her cause of action. In other words, that the engagement having been broken in 1907, any cause of action that she may have had was barred by the statute of limitations.

On the other hand, it is insisted by counsel for plaintiff that the contract was not broken, and that, while the evidence shows that no

definite date was fixed for the marriage of the parties, their engagement was continuous, and extended over a period of about 17 years, and was in existence at the time of the institution of this action. We think it clearly appears from the evidence that, while no definite time was fixed for the marriage, they were to be married as soon as the defendant was able.

[1] While there are several assignments of error, the principal question to be determined is as to whether there was sufficient evidence offered by the plaintiff to sustain the verdict in her favor, and in order to determine this point we deem it necessary to refer briefly to some of the evidence relied upon by the plaintiff in the court below.

It appears that in 1895 the defendant either borrowed or was given the plaintiff's gold watch, which he retained in his possession until the 3d day of October, 1911, at which time it was returned to plaintiff by registered mail. Testimony shows that numerous letters passed between the parties, some of which were lost or destroyed, and some were mutilated and used by plaintiff in a sofa pillow. It also appears that there was a mutual exchange of gifts and post cards containing some declarations of love and some references to marriage.

Plaintiff testified that defendant agreed to keep her watch as a seal of their engagement, and that he was to retain it until their marriage. The fact that he kept plaintiff's watch in his possession from 1895 until the 3d day of October, 1911, is not controverted. Plaintiff also testified that the last time she had conversation with the defendant about the watch he stated that when he returned the watch he would marry her. Defendant in testifying as to this matter said:

"I expected to visit Miss Fullhart and return the watch to her if we never married."

The defendant in response to a question by counsel for plaintiff, among other things, testified as follows:

"Q. Now, Mr. Thrush, you testified that you told her that you expected to be married, and that you would marry her as soon as you completed your course at Lane Seminary, did you not? A. That was the understanding.

"Q. After that time and during all of these years that you corresponded with her, did you mention that to her in any of these letters that you wrote while you were on the farm, busy at hay harvest, and Christmas time, and all those times? A. That we would get married?

"Q. Answer the question. A. You mean, in any of these letters?

"Q. Yes, sir. Take them and sort them out and point them out to the jury.

"Q. Yes, in any of the letters that you wrote, did you tell her when you were going to marry her? A. No, sir.

"Q. Why didn't you tell her? A. Why didn't I set a time?

"Q. Yes. A. Because I wasn't ready to get married, and she understood my circumstances."

It appears from the testimony of defendant that he was not willing to fix a date for the marriage on account of the fact that his financial condition was not satisfactory. On the 7th day of August, 1904, defendant wrote plaintiff a letter in which, among other things, he said:

"Now, don't understand me that my people are opposed to you in particular, but they know we are very intimate and would like to get married, and they think I am not ready to get married yet. They are not opposed to you any more than they would be to any girl they know here that I ought to go with.

My father is old and has got the idea in his head I spend entirely too much money going to school it don't look at the satisfaction it is to me to have a good education by simply from dollars and cents. Now it would be impossible for me to start into anything like business without his help. I have been working here several years and have greatly reduced the amount I received for my schooling and father often speaks now of helping me into something when there is a good opening and he will if I don't cross him."

In the concluding paragraph of the letter, the defendant also says:

"Now, write me a good cheering letter, and be a good loving girl till I can see you. Good night, with all my love and best wishes."

Defendant also testified that he received a letter in August, 1911, from the plaintiff in which she said, "I want to know whether I am to be or not to be," and that he wrote her a short letter in reply. Plaintiff, among other things, testified that she received a letter in August, 1911, in reply to a letter which she had written defendant requesting him to advise her as to what was to prevent their marriage; that in response he said that the estate was not settled, and he could not marry until it was settled.

It was shown that defendant's father, who was a wealthy farmer, died on the 15th day of April, 1910, leaving a large estate; that the defendant and James A. Thrush, a brother, qualified as administrators of the estate. Shortly after defendant had qualified as one of the administrators, the defendant began to pay attention to Miss Mary E. Whip, but did not become engaged to her until about three months before they were married, to wit, during the month of August, 1911, which, according to the testimony, was about the time the defendant wrote the last letter to the plaintiff.

Defendant, in response to a question, among other things, testified as follows:

"Q. You may state whether or not the engagement was broken off. If so, when and under what circumstances? A. Yes, gentlemen, this engagement was broken off in the summer of 1907, by a letter written by me to this lady.

"Q. Now, Mr. Thrush, to what letter written by you was this letter of July 19, 1907, an answer? A. This letter of July 19, 1907, is not a direct answer to the letter that I wrote, but is a second letter that was written in explanation of what she had written. She wrote me two letters. The first one I have not got, but she accepted that as breaking off of the engagement in that letter, and this letter is simply written explaining. She said that she was afraid that I did not understand what she had written in the first letter. She did not mean that we would drop the correspondence, though we would never marry.

"Q. Do you know what become of the letter that was written just previous to this one and which was a direct answer to your letter? A. I suppose it was destroyed.

"Q. Have you searched for it? A. I have searched for it.

"Q. Have you been unable to find it? A. Yes, sir.

"Q. Tell the jury, as nearly as you can, what she said to you in that letter which you say was a direct reply to your letter breaking off the engagement? A. She agreed to the proposition that I then made, and I cannot state clearly what, if anything, she said about a continuance of the correspondence. But from this letter, I suppose, she made some reference to a further correspondence, just as friends. Just a friendship correspondence."

The plaintiff also denied that the defendant wrote her in 1907 or any other time that the engagement was broken, and that he would not marry her; that he had promised to visit her at Christmas, 1908,

and she offered in evidence a letter to corroborate this statement dated January 3, 1909, in which, among other things, defendant said:

"You would not know me as my hair is at least one-half gray. Sometime I will send you a sample. Expect I look as young as ever in my face. Am much stouter than when you use to see me. My weight runs about 160 to 165 lbs. Expect your weight about 60, do you not? I am very well in every way save an occasional attack of sick headache. The book you sent was received. Many thanks for same. Will repay the compliment in some substantial way in the future."

The closing sentence of this letter is in the following language:

"Well, I will close for this time. Hope you enjoyed Xmas, if I did not show up. Hope you are well."

It also appears that on March 25, 1909, the defendant sent a post card which was printed in a wreath of forget-me-nots, "To My Sweet Love." On March 25, 1909, defendant also wrote plaintiff a letter or post card in which, among other things, he said:

"I passed the 40th milestone of my existence not long since. Don't see any difference since I have become an old bachelor. Believe I am better looking than ever and you know I always was quite a beauty, at least some lady use to tell me so. * * * Why in the world don't Inez and her best get married and set some of her old friends a good example. It costs $2.00 in this state now for license besides clerical charges and that depends on the estimate the groom places on the bride."

The defendant testified that in his letter written during the summer of 1907 he stated positively that he did not intend to marry plaintiff, and, among other things, introduced a letter written by the plaintiff in July, 1907, from which he quoted certain statements as follows:

"We certainly need not deprive ourselves of the pleasure of corresponding, even though we never marry. I love to get your letters and will eliminate from my correspondence anything that pertains to love or matrimony. * * * How foolish it will be to deprive ourselves of this pleasure, just because we cannot get married. Maybe we can get more pleasure out of a life devoted to correspondence than we would out of matrimony. What I am interested in now is your friendship, which I am too glad to accept if that is all you have to give me. I will be satisfied with small favors."

It is contended on behalf of plaintiff that some of the statements contained in this letter, if taken alone, would tend to sustain the contention of the defendant. On the other hand, the expression "even though we never marry," to say the least of it, tends to corroborate the evidence of plaintiff to the effect that the contract of marriage had not at that time been terminated, and certainly shows that she thought there was a possibility of marriage in the future.

The plaintiff while on the witness stand, among other things, testified as follows in regard to this letter:

"Q. Was this letter written in answer to a letter from him? A. No, sir.

"Q. You received no letter from him, then, just prior to July 19, 1907, that this could be an answer to? A. This is not an answer to a letter from him.

"Q. Why did you say: 'We certainly need not deprive ourselves of the pleasure of correspondence even though we never marry?' 'I love to get your letters and will eliminate from my correspondence anything that pertains to love and matrimony and will only write a letter to a friend from a friend'? A. In order to answer that I will have to explain what the letter is.

"Q. I am not asking you to explain the letter. I am asking you why it was you wrote this letter, the letter speaks for itself. A. Well, prior to this letter I had received a letter from Mr. Thrush, and in that letter it was very discouraging, as all of his letters had been, that we couldn't get married now, that we would have to wait until he was in a position to get married, and that his father was very much opposed to his marrying, and that we must not do anything to cross his father in any way, because it would be worse for both of us if we did, and the only thing we could do was to wait until he was able to marry, and that is the substance of his letters, but is not word for word, but is the substance of it, so, in answer to that letter, I will say that the letter he wrote provoked me and I answered the letter in a rather provoked spirit. And I told him that I was tired of waiting and that our correspondence— We had better quit corresponding until he got over his blues, that his letters were all discouraging and maybe if he quit writing he would get over his blues, and that was the spirit of the letter I had wrote, but as for any word I wrote, I do not know, but that is the spirit of the letter that I wrote. I mailed that letter, but after I had written the letter, of course I repented of what I had said. I thought maybe I had said too much. So, I wrote this letter, as you have heard the letter read, and I told him I thought perhaps he did not understand my feelings about the matter, that I did not want to quit corresponding with him, so I wrote that letter, that was the spirit I had when I wrote the letter, that I did not want to quit corresponding, but wanted to continue our corresponding, that I did not see how I could get along without it. I think that answers your question.

"Q. You testified in this case on the former trial, didn't you? A. Yes, sir.

"Q. In your testimony then, did you not say that Mr. Thrush wrote to you, and that he was very much discouraged, and that his letters often were discouraging? 'A. He was very much discouraged, and he asked me if I thought I could live on the farm, that he was afraid probably I would not like farm life, and he did not say in this letter that he thought—He did not say in his letter the engagement was broken. He simply asked what I thought about —if I would like farm life, if I thought I could live on a farm, and if we thought we could marry.' I think that is the substance of the letter.' A. I said that."

The plaintiff, in response to a question from the court, said:

"A. This promise was relied upon by me at all times from the time of the engagement until it was broken, which was November 1, 1911, when the watch returned, just a short time before Mr. Thrush was married."

In this connection, it should also be borne in mind that the defendant promised to visit her at Christmas, 1908. On the 3d day of January, 1909, the defendant wrote to plaintiff, as we have already stated, that he hoped she had enjoyed Christmas even though he did not show up. This is the letter in which he comments on his personal appearance, and acknowledges the receipt of a present which she had sent him. On the 3d of March of the same year defendant again writes to the plaintiff inclosing the post card in a wreath of forget-me-nots "To My Sweet Love." This conduct on the part of the defendant tends to corroborate the evidence of the plaintiff. In other words, if the evidence of the plaintiff is to be believed, and much of it is not controverted, this defendant entered into a contract of marriage with the plaintiff, and accepted her watch as a seal of the engagement, which he kept until the 3d day of October, 1911, and in addition to that he sent the post card and other communications indicating that he still loved the plaintiff and that it was his purpose to comply with the contract.

The character of the plaintiff, according to the record, is not assailed in any sense of the word. While at college she became engaged to the defendant, who was also a student, and contrary to the usual custom she was required by the defendant to place her watch in his custody as a seal of the vows they had taken. That she had implicit confidence in the honesty and integrity of the defendant is evidenced by her letters, as well as the loan which she secured for him from her sister and the presents which she sent him from time to time.

The evidence as to whether the contract had been broken in 1907 was conflicting, and was such that reasonable men might differ as to the inference to be drawn therefrom. Under these circumstances, we think the refusal of the court below to direct a verdict in favor of the defendant was eminently proper.

[2] Among other things, it is insisted on behalf of the defendant that the plaintiff's right of action is barred by the statute of limitations. The statutory bar in West Virginia is one year for an action for damages for breach of promise to marry. It is insisted that the evidence offered by plaintiff clearly shows that this action was commenced within one year from the time the cause of action accrued.

On the other hand, it is insisted by counsel for defendant that the plaintiff has failed to show that suit was commenced within a year from the time the contract was broken. This question was properly submitted, and the jury having found in favor of the plaintiff the same is not reviewable, inasmuch as the evidence bearing on this point is conflicting.

It is further insisted that the court below erred in granting instructions Nos. 1, 2, 3, 4, and 5, these being the same instructions that were granted by the court at the former trial. This court, in referring to these instructions, said:

"Without stating the various propositions submitted, or discussing the questions they severally present, it is sufficient to say that, in our judgment, none of these instructions involve substantial error. Even if they be regarded as favoring the plaintiff's contention, we are not persuaded, in view of the pleadings and evidence, that they were incorrect or unwarranted."

Instructions Nos. 6, 7, and 8 properly presented the law in view of the facts of this case. Therefore the assignments of error as to the court's action in respect to these instructions are without merit.

[3] It is also insisted that the verdict is clearly excessive. The evidence shows that plaintiff, a young lady of many accomplishments and good character, was induced by the promises and representations of defendant to believe that he would marry her, and acting in accordance therewith she practically gave the defendant 17 years of the best part of her life, during which time she was not in a position to consider a proposition to marry from any one else.

The evidence also shows that the defendant is worth about the sum of $12,000. He was engaged to the plaintiff for a period of 17 years. It further appears that defendant induced plaintiff to borrow from her sister the sum of $50, which he agreed to repay, but never did; that plaintiff loaned defendant money to buy books; and that he borrowed money from plaintiff, kept plaintiff's watch during the time

of their engagement, and accepted presents from plaintiff from time to time.

While the defendant would have been liable had he promptly terminated the engagement on his return home from school, perhaps the jury in its discretion would not have returned a verdict as large as the present one.

[4, 5] The evidence shows that the plaintiff had reasonable expectations of an advantageous settlement in life, and for such she would be entitled to recover damages, and in addition thereto for pecuniary loss, as well as compensation for injured feelings, anxiety of mind, wounded pride, and mortification in consequence of the treatment which she received at the hands of the defendant. It would be impossible in a case like the one at bar to fix a definite measure of damages. Therefore in a case of this character the jury may take into consideration all the facts and circumstances, and, if their conduct is not marked by prejudice, passion, or corruption, exercise their discretion in determining the amount which the plaintiff is entitled to recover.

[6] The rule applicable where it is sought to set a verdict aside for excessive damages is well stated in the case of Hoagland v. Moore, 2 Blackf. (Ind.) 167, in which the court, among other things, said:

"Where a new trial is applied for on account of excessive damages, and refused, the damages must be outrageously excessive, or a court of error will not interfere."

In view of the facts and circumstances of this case, we are of opinion that the verdict is justified by the evidence, and are therefore not inclined to disturb the same.

For the reasons stated, the judgment of the lower court is affirmed.